AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of Virginia

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

information associated with five Instagram accounts
within the possession, custody, and control of Meta
Platforms, Inc.

)
)
)
)
)
)
)

Case No.  4:24-sw-75

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ Northern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C 1201(c) | conspiracy to commit kidnapping |
| 18 U.S.C 1201(a) | kidnapping resulting in death |
| 18 U.S.C 1959(a)(1) | murder in aid of racketeering |

The application is based on these facts:

See attached affidavit

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Reviewed by AUSA/SAUSA

/s/ Mack Coleman
Mack Coleman

_____
*Applicant's signature*

Daniel F. Woloszynowski II, Special Agent, ATF
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____ 05/03/2024 _____

_____
*Judge's signature*

City and state: Norfolk, Virginia

Robert J. Krask, U.S. Magistrate Judge
*Printed name and title*

THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Newport News Division

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH THE INSTAGRAM ACCOUNTS **@SKAR_BINHATED**, **@STANDIN0NBUSINESS**, **@JAHH.DUNDADA**, **@THEREALHENNESSI_**, AND **@TEELOCD**, WITHIN THE POSSESSION WITHIN THE POSSESSION, CUSTODY, OR CONTROL OF META PLATFORMS INC | No. 4:24-sw-__75__ |

## AFFIDAVIT IN SUPPORT OF PROBABLE CAUSE

I, Bureau of Alcohol, Tobacco, Firearms and Explosives Special Agent, Daniel "Dan" Woloszynowski II, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for information associated with the Instagram user accounts:

@skar_binhated ("**TARGET ACCOUNT 1**"), user ID of 7892670261
@standin0nbusiness ("**TARGET ACCOUNT 2**"), user ID of 1644937064
@jahh.dundada ("**TARGET ACCOUNT 3**"), user ID of 50202794176v
@therealhennessi_ ("**TARGET ACCOUNT 4**"), user ID of 1969634825
@teelocd ("**TARGET ACCOUNT 5**"), user ID of 3628629711

(collectively the "**TARGET ACCOUNTS**") that is stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc. ("Meta"), a provider of electronic services and/or remote computing service provider headquartered at 1601 Willow Road in Menlo Park, California.

2.      The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Meta to disclose to the government copies of the information further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

3.     I am a Special Agent ("SA") with the Bureau of Alcohol, Tobacco, Firearms & Explosives ("ATF"), and have been since May of 2022. I, have completed in excess of 400 hours of instruction at the Federal Law Enforcement Training Center in Glynco, Georgia and graduated from the Criminal Investigator Training Program and the ATF National Academy, Special Agent Basic Training.

4.     As an SA with ATF, I am a federal law enforcement officer as described in 18 U.S.C. § 2510(7). I am responsible for investigating and enforcing violations of federal law in accordance with 18 U.S.C. § 3051. As an ATF SA assigned to the Newport News Field Office, I have investigated individuals for illegal possession and use of firearms, illegal possession, and distribution of controlled substances, and for committing violent crimes. In the course of those investigations, I have executed arrest warrants, conducted physical and electronic surveillance, executed search warrants, and seized and reviewed evidence. I have conducted investigations for a variety of violations of federal and state law, including cyber investigations, investigations involving the purchase of contraband via the internet, and a variety of offenses involving firearms, violent offenses, and criminal organizations. I have also interviewed witnesses and victims, and have worked with cooperating individuals.

5.     The facts in this affidavit come from my personal observations, my training and experience, and information I have obtained, either directly or indirectly, from witnesses, my review of records and documents, and information obtained from other law enforcement officers and agents. I have not included each and every fact that my investigation has revealed, but rather, have included only those facts necessary to show probable cause at time of this affidavit therein. This affidavit is intended to show merely that there is probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

6.     Based on the facts set forth in this Affidavit, there is probable cause to believe that **HEZEKIAH CARNEY** ("CARNEY"), **DONNISHA GOODMAN** ("GOODMAN"), **ACACIA JACKSON** ("JACKSON"), **JAYQUAN JONES** ("JONES"), and **JAMICA LANGLEY** ("LANGLEY" and collectively, the "defendants"), have violated 18 U.S.C. § 1201(c) (Conspiracy to Commit Kidnapping), 18 U.S.C. § 1201(a)(1) (Kidnapping Resulting in Death), and 18 U.S.C. § 1959(a)(1) (Murder in Aid of Racketeering).[1] There is also probable cause to search the information described in Attachments A for evidence of these crimes as further described in Attachment B.

7.     The Court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated, 18 U.S.C. § 2711(3)(A)(i).

---

[1] The grand jury previously indicted GOODMAN and JACKSON for violating 18 U.S.C. §§ 1201(a) and 1201(c) on January 16, 2024. On March 5, 2024, JACKSON pled guilty to violating 18 U.S.C. § 1201(c). On April 10, 2024, the grand jury returned a superseding indictment charging CARNEY, JONES, LANGLEY, and GOODMAN with violations of 18 U.S.C. §§ 1201(a) and 1201(c). The government is continuing to investigate the gang-related offenses to determine whether to seek another superseding indictment charging murder in aid of racketeering in violation of 18 U.S.C. § 1959(a)(1).

## PROBABLE CAUSE

### A.    Background

8.    Federal law enforcement agencies, including ATF and the Federal Bureau of Investigations ("FBI") as well as state and local law enforcement agencies (hereinafter, the "investigative team") have been investigating the May 6, 2023, murder of T.M., who was affiliated with a criminal street gang called the Black P. Stones, amongst other things.

### B.    The May 6, 2023, Murder of T.M.

9.    On or about May 6, 2023, at approximately 6:30 a.m., a resident of York County, Virginia, called 911 after identifying what appeared to be a person lying in the woods off of Old Williamsburg Road.

10.    Members of the York-Poquoson Sheriff's Office ("YPSO") responded to the complaint and discovered a deceased black female laying in the wood line off of Old Williamsburg Road near the cross street of Daniels Drive, in York County. The female was found without shoes on, nor was the female wearing a bra.

11.    York County is within the Eastern District of Virginia.

12.    Members of the YPSO canvassed the area around the crime scene for information about the crime. A resident reported hearing several gunshots at approximately 3:47 a.m.

13.    Members of the YPSO determined the identity of the victim to be T.M., with a last known address of an apartment located at **** Bethel Street, Richmond, Virginia.

14.    Members of the YPSO collected 14 total 9mm cartridge casings with the headstamp "S&B" from the scene.

15.    A subsequent autopsy conducted by the Office of the Chief Medical Examiner for the Commonwealth of Virginia found that T.M. suffered eight gunshot entry wounds.

16.    According to the Medical Examiner, T.M.'s cause of death was determined to be multiple gunshot wounds, and the manner of death was found to be homicide.

17.    Members of the YPSO initiated an investigation into the homicide. They interviewed friends and family members of T.M.

18.    Members of the YPSO also obtained video footage from relevant businesses near the scene of the homicide and near T.M.'s residence, reviewed T.M.'s social media accounts, and searched T.M.'s apartment pursuant to a state authorized search warrant.

### C.    Surveillance Video Footage from the Vicinity of T.M.'s Residence

19.    Members of the YPSO collected video footage from outside T.M.'s apartment on the evening of May 5, 2023, through the morning of May 6, 2023.

20.    I reviewed surveillance footage showing that at approximately 1:08 a.m. on May 6, 2023, a dark-colored sedan with a defect in the right taillight arrived at T.M.'s residence. The footage further revealed that, at approximately 1:14 a.m., four subjects exited the sedan and walked towards T.M.'s residence on Bethel Street. At approximately 1:38 a.m., multiple subjects departed the area in the dark colored sedan with the taillight defect.

21.    I have also reviewed surveillance footage showing that at approximately 2:28 a.m., the dark-colored sedan with the taillight defect returned. After parking, five individuals exited the vehicle and approached T.M.'s residence.

22.    I reviewed surveillance footage showing that members of the group entered T.M.'s residence. Simultaneously, five individuals and T.M. departed the area in the dark colored sedan with the taillight defect, while a male individual wearing a white undershirt appeared to have fled the area.

### D.    Investigators Identified a Black Hyundai Sonata Used in the Crime

23.    Members of the Richmond Police Department ("RPD") identified a vehicle of interest based on the 911 call by an associate of the victim, surveillance footage from the victim's housing, and other public cameras in the City of Richmond.

24.    Members of RPD confirmed the vehicle of interest was a black Hyundai Sonata sedan bearing Virginia license plate ending in 9340.

25.    Members of the YPSO conducted a check with the Virginia Department of Motor Vehicles, which revealed that Donnisha GOODMAN ("GOODMAN") was the registered owner of the Hyundai sedan.

26.    Law enforcement issued a statewide "Be On the Lookout" for the vehicle.

### E.    Surveillance Video Footage on the Route to the Scene of the Murder

27.    Members of the YPSO also collected surveillance video from local businesses near the scene of the murder in York County. According to reports from YPSO, footage from W & J Auto Repair, located at **** Jefferson Avenue, in Newport News showed that the Hyundai sedan with the taillight defect arrived at an adjacent 7-Eleven gas station at approximately 3:29 a.m.

28.    Members of the YPSO collected additional footage from inside the 7-Eleven gas station, located at ***** Jefferson Avenue, Newport News, and identified two individuals believed to be LANGLEY and her brother, co-conspirator Jayquan JONES ("Jones"), who entered the store and paid for items with cash.

29.    From inside the 7-Eleven store, video surveillance shows a woman who matches LANGLEY's appearance entered at around 3:32 a.m. and briefly interacted with an employee at the register.  The woman was holding a white purse with a black chain.  She left the store about thirty seconds later, was seen standing in the parking lot outside the store door, and returned at 3:33 a.m. with a mask covering the lower half of her face.  A man matching JONES's appearance entered the store about thirty seconds later, and stood next to LANGLEY as she continued to interact with the store employee at the register.  There is no audio with the surveillance video.

30.    The surveillance video inside the 7-Eleven shows JONES and LANGLEY leaving the store without appearing to purchase anything at 3:34 a.m. and walk toward the area where the Sonata was parked.  JONES and LANGLEY enter the store one more time at 3:35 a.m., at which point LANGLEY no longer appears to be wearing a face mask, and about ten seconds later LANGLEY can be seen putting her face mask back on.  LANGLEY purchases what appears to be cigarettes using change and she and JONES depart the store for a final time just before 3:37 a.m.

31.    The footage showed that the Hyundai sedan with the taillight defect departed at approximately 3:38 a.m., heading east on Route 238, toward Old Williamsburg Road and the scene of the murder.  The 7-Eleven gas station at ***** Jefferson Avenue is approximately 3.6 miles from the scene of the murder and over fifty miles from Bethel Street.

32.    Members of the YPSO also collected and reviewed video surveillance from the Yorktown Revolutionary War Museum at *** Water Street, which showed a dark-colored sedan drive to the building entrance approaching from the area of Old Williamsburg Road, and make a U-Turn to return to Old Williamsburg Road at approximately 3:44 a.m.  The angle of the video surveillance and intervening vegetation prevent me from analyzing the vehicle's taillights.  The Yorktown Revolutionary War Museum is less than a mile from the scene of the murder.

33.    Members of the YPSO collected video surveillance from an Exxon located at **** New Kent Highway in Quinton, Virginia, which is between Yorktown and Richmond.  That footage revealed a dark-colored Hyundai sedan with taillight defect arrive at approximately 4:32 a.m.  After waiting for a customer at an adjacent pump to leave, a black male wearing a white shirt and what appears to be a black mask, believed to be co-conspirator CARNEY exits the driver side passenger door and begins pumping gas.  When he is finished, he opens the driver's door.  A black female with long, straight, blue hair wearing a black and white hat exits the driver's position in the vehicle, and changes places with Carney.  The vehicle then departs the gas station at approximately 4:42 a.m.  The Exxon gas station is approximately 46 miles from the scene of the murder.

**F.    <u>Surveillance Video Footage at the Scene of the Murder</u>**

34.    Members of the YPSO collected video surveillance from residences and a church located in the general vicinity of Old Williamsburg Road.  The relative rural setting of the crime scene, coupled with the specific locations of the residences and church, resulted in no relevant video surveillance.

## G.    Investigators Recovered the Hyundai Sonata

35.    On May 7, 2023, at approximately 5:29 a.m. in Norfolk, Virginia, Norfolk Police located and stopped the Hyundai Sonata registered to GOODMAN. I have reviewed the police report for this traffic stop, which noted that LANGLEY, GOODMAN, and co-conspirator JACKSON were present in the vehicle.

36.    Members of the YPSO then obtained and executed a search warrant for the Hyundai Sonata. According to a YPSO report, among the items found in the vehicle were a 9 mm cartridge with the headstamp "S&B," multiple cellular phones, and a black face mask. They also recovered a white purse on a black chain, that contained several prescriptions for medications written for LANGLEY dated from May 5, 2023. The purse was visually consistent with the one seen with LANGLEY on the 7-Eleven surveillance footage discussed in paragraph 29.

37.    I reviewed the shape and features of the black Hyundai Sonata identified by members of the RPD and compared it to the dark colored sedan with the taillight defect reviewed from surveillance footage in the vicinity of T.M.'s residence. The dark colored sedan appears to be the Hyundai Sonata identified herein.

## H.    Arrest of LANGLEY and Goodman

38.    On May 10, 2023, members of law enforcement conducted surveillance on addresses of the suspects involved in T.M.'s murder, including *** Green Street in Portsmouth, Virginia, an address believed to be associated with GOODMAN.

39.    A member of YPSO observed a male and three females exit the building located at *** Green Street, and recognized them as LANGLEY, GOODMAN, JACKSON, and CARNEY. Law enforcement arrested LANGLEY, JACKSON, and CARNEY on outstanding arrest warrants for the murder of T.M. Goodman was released because they did not yet have a warrant for her arrest.[2]

40.    When CARNEY was arrested, PPD officers found a firearm in his waistband and eighteen small baggies of suspected narcotics from CARNEY's front left pocket. The firearm recovered from CARNEY has been forensically examined by the Virginia Department of Forensic Science, and it was eliminated as having fired the cartridge cases found at the scene of T.M.'s murder. CARNEY's firearm did, however, have similar rifling-class characteristics like a bullet found in T.M.'s body during her autopsy.

41.    On May 11, 2023, JONES called law enforcement, stating that he wanted to turn himself in. Members of the RPD went to JONES' mother's house in Richmond, where they arrested JONES. During the arrest, individuals at the home shouted at JONES not to say anything

---

[2] At that time, YPSO was still waiting for outstanding cell phone location information for Goodman's phone. Once they received the information described in further detail below, they obtained an arrest warrant for Goodman.

and JONES replied, "see you in a few years." When JONES was arrested, he was not in possession of a cellular telephone device.

42.     JONES later asked for an attorney and declined to speak with members of the RPD.

43.     GOODMAN turned herself in pursuant to an arrest warrant at the Portsmouth Police Department on June 12, 2023. She declined to speak with law enforcement.

**I.      Information Obtained to Date from Phone Records and Searches of Cellular Phones**

44.     YPSO investigators obtained call detail records ("CDR") including cell-site location information ("CSLI") and more precise location data known as Timing Advance records ("TA") or Historical Precision Location Information ("HPLI") pursuant to search warrants from the respective service providers for the cellular telephones used by CARNEY, GOODMAN, and JACKSON. Additionally, location data was extracted from cellular telephones seized from CARNEY, GOODMAN, JACKSON, and LANGLEY and forensically examined pursuant to search warrants. This location information puts the cellular phones for the defendants in the vicinity of the gang-related "beating," the later abduction of T.M. from her, and the scene of the murder, as described in further detail below.

  a.     <u>LANGLEY</u>

45.     A forensic extraction for the cellular telephone associated with LANGLEY showed that it was traveling on Interstate 64 towards Richmond around midnight on the morning of May 6, 2023. These location points coincide with the location data associated with CARNEY and GOODMAN, which show all three traveling to Richmond at the same time. Between 2:23 a.m. and 2:24 a.m., the location data for LANGLEY's cellular telephone shows that it was in the area of LANGLEY's and JONES' residence at **** St. James Street in Richmond. From 2:28 a.m. to 2:36 a.m., the location data further showed LANGLEY's cellular telephone in the area of T.M.'s residence located at **** Bethel Street in Richmond. At 2:38 a.m., LANGLEY's location data indicated that her cellular phone was in the Mosby Court housing development located just south of T.M.'s residence.

46.     A few hours later, at 4:43 a.m., the next location data showed LANGLEY's cellular telephone approximately less than mile west of the Exxon gas station located at **** New Kent Highway in Quinton. The cellular telephone seemed to be traveling on Interstate 64 West, as there were a total of seven location points moving towards the Richmond area. Between 5:29 a.m. and 5:34 a.m., LANGLEY's cellular telephone appeared to be in the area of LANGLEY's and JONES' residence at **** St. James Street in Richmond.

  b.     <u>JONES</u>

47.     Law enforcement has reason to believe that JONES was using a cellular device at the time of the homicide ending in the last four digits 5825. Investigators originally obtained CDRs for a telephone number associated with JONES; however, the records did not contain any CSLI and it's too late to obtain TA records which are stored for a limited amount of time. Investigators later

obtained a search warrant for CDRs with CSLI for JONES' telephone. Unfortunately, those records only reflect five data points with CSLI for May 5 and 6, 2023. However, the CSLI for JONES' telephone does reflect that on May 5, 2023, at 8:35 p.m. and on May 6, 2023, at 1:41 a.m. to 1:42 a.m., and at 9:47 a.m., the tower and sector coverage area encompasses the area of the JONES/LANGLEY residence and the Ms. Mitchell's residence. Despite JONES' telephone being turned off or not used for the majority of the incidents described herein, JONES was observed on video surveillance with LANGLEY at the 7-11 store located at 14500 Jefferson Avenue, Newport News, VA, on May 6, 2023, from 3:29 a.m. to 3:38 a.m., just prior to the murder of Ms. Mitchell in close proximity to the 7-11 store.

48.     An analysis of the CDRs for JONES' telephone reflects contact with the following co-conspirators and Ms. Mitchell, the victim:  291 text messages and 42 voice calls with CARNEY from March 20, 2023, to May 5, 2023; 59 text messages and 22 voice calls with LANGLEY from April 26, 2023, to May 6, 2023; 31 voice calls and 26 text messages with JACKSON from April 16, 2023, to May 6, 2023; 40 text messages and 8 voice calls with GOODMAN from March 26, 2023, to May 4, 2023; and 25 text messages and 4 voice calls with Ms. Mitchell from March 26, 2023, to April 28, 2023. The CDRs for JONES' telephone further reflects that the only activity on May 6, 2023, prior to Ms. Mitchell being murdered, were two incoming unanswered calls from JACKSON at 1:41 a.m. and 1:42 a.m.   The next activity on JONES' telephone was at 5:47 a.m., which was the beginning of a text conversation with JACKSON.

c.     JACKSON

49.     As noted above, members of the YPSO recovered JACKSON's cellular telephone during the May 7, 2023, traffic stop and search of the Hyundai Sonata. Members of the YPSO obtained CDRs with CSLI and TA records associated with a telephone number subscribed to JACKSON.  Notably, JACKSON made three outgoing calls to T.M.'s telephone number on May 6, 2023, once at 1:10 a.m. and two times at 1:15 a.m., but it appears that the calls were not answered.

50.     From 1:08 a.m. to 1:39 a.m. on May 6, 2023, JACKSON's cellular telephone appeared to be in the area of T.M.'s residence located at **** Bethel Street, Richmond, Virginia. From 1:46 a.m. to 2:23 a.m., JACKSON's cellular telephone appeared to leave that area and move to the area of **** St. John Street, where LANGLEY and JONES live.  From 2:27 a.m. to 2:34 a.m., JACKSON's cellular telephone moved back towards T.M's residence. At 2:36 a.m., JACKSON's cellular telephone left the area of T.M.'s residence and moved eastbound on Interstate 64 towards York County, Virginia.  From 3:07 a.m. to 3:40 a.m., JACKSON's cellular telephone had no record of location data.

51.     At 3:40 a.m., JACKSON's cellular telephone was in the vicinity of Yorktown Road and Jefferson Avenue in Newport News, which is close to the 7-Eleven mentioned in paragraphs 27-31, and then traveled down Yorktown Road and crossed into York County to where Yorktown Road changes to Old Williamsburg Road. At 3:42 a.m., JACKSON's cellular telephone was in the vicinity of Browns Lane and Old Williamsburg Road, which is approximately 1.58 miles or approximately a three-minute drive away from where T.M. was murdered.

52.    From 3:51 a.m. to 3:59 a.m., JACKSON's cellular telephone appeared to be moving westbound on Interstate 64, away from the crime scene on Old Williamsburg Road. From approximately 4:31 a.m. to 4:41 a.m., JACKSON's cellular telephone left the interstate and appeared to be in the vicinity of the Exxon gas station mentioned above. From 4:41 a.m. to 4:55 a.m., JACKSON's cellular telephone continued westbound on Interstate 64 into Richmond.

d.    <u>CARNEY</u>

53.    CARNEY was in possession of his cellular telephone at the time of his arrest on May 10, 2023. Members of the YPSO obtained CDRs with CSLI and TA records for the telephone number associated with the phone recovered from CARNEY's person during his arrest. From 1:08 a.m. to 1:41 a.m. on May 6, 2023, CARNEY's cellular telephone appeared to be in the area of T.M.'s residence. From 1:46 a.m. to 2:24 a.m., CARNEY's cellular telephone appeared to leave that area and move to the area where LANGLEY and JONES live. From 2:26 a.m. to 2:34 a.m., CARNEY's cellular telephone moved back towards T.M.'s residence and at 2:36 a.m., CARNEY's cellular telephone left the area of T.M.'s residence and traveled eastbound on Interstate 64 towards York County, Virginia.

54.    About an hour later, at 3:32 a.m., CARNEY's cellular telephone was in the vicinity of Yorktown Road and Jefferson Avenue in Newport News, which is close to the 7-Eleven mentioned above and within 3.04 miles of where T.M. was murdered. There was no more activity from CARNEY's cellular telephone until 7:06 a.m. on May 6, 2023, when the HPLI for CARNEY's cellular telephone showed that it was in Virginia Beach, Virginia.

e.    <u>GOODMAN</u>

55.    Members of the YPSO obtained CDRs with CSLI and HPLI records for a telephone number associated with GOODMAN and seized from her during the traffic stop of the Sonata on May 7, 2023. GOODMAN was in possession of her cellular telephone when GOODMAN was stopped by law enforcement on May 7, 2023. From 1:06 a.m. to 1:42 a.m. on May 6, 2023, GOODMAN's cellular telephone appeared to be in the area of T.M.'s apartment on Bethel Street. From 1:45 a.m. to 2:23 a.m., GOODMAN's cellular telephone appeared to leave that area and move to the area of where LANGLEY and JONES lived. From 2:25 a.m. to 2:36 a.m., GOODMAN's cellular telephone moved back towards T.M.'s residence. At 2:37 a.m., GOODMAN's cellular telephone left the area of T.M.'s residence and traveled eastbound on Interstate 64 towards York County.

56.    On May 6, 2023, between 3:30 a.m., and 3:40 a.m., GOODMAN's cellular telephone was in the vicinity of Yorktown Road and Jefferson Avenue in Newport News, close to the 7-Eleven mentioned above. The phone then traveled down Yorktown Road and crossed into York County, to where Yorktown Road changes to Old Williamsburg Road. At 3:44 a.m., GOODMAN's cellular telephone was within .88 miles of where T.M. was murdered. From 3:50 a.m. to 3:56 a.m., GOODMAN's cellular telephone appeared to be moving westbound on Interstate 64, away from the crime scene on Old Williamsburg Road. From approximately 4:30 a.m. to 4:33 a.m., GOODMAN's cellular telephone left the interstate and appeared to be in the vicinity of the

Exxon gas station mentioned above. From 4:43 a.m. to 4:54 a.m., GOODMAN's cellular telephone continued moving westbound on Interstate 64 into Richmond.

## J.    Cooperating Witnesses

57.    Members of the investigative team, including myself, have interviewed Cooperating Witness 1 (hereinafter CW-1), Cooperating Witness 2 (hereinafter CW-2), and Cooperating Witness 3 (CW-3). The following paragraphs include some of the information obtained during those interviews.

58.    During the early morning hours of May 6, 2023, T.M. told CW-1 that she had just been attacked by three female members of the gang while a male member watched.

59.    CW-1 knew T.M. to be in a gang, understood she carried the title, "First Lady," and believed she was required to attend meetings in Norfolk, Virginia.

60.    On May 5, 2023, T.M. spent the day with her friend, CW-2. CW-2 overheard a phone conversation in which T.M. said that several members of her gang were coming to "jump her out" earlier in the week, but they got a flat tire and were unable to make it to Richmond.

61.    On May 5, 2023, T.M. further told CW-2 that she expected members of the organization to try again, and this worried her. She added that if they are coming to get her, then she is going to be beaten out in a "body bag."

62.    On the morning of May 6, 2023, at approximately 1:58 a.m., after the first attack, T.M. sent CW-2 a Facebook message containing photographs of T.M.'s injuries that T.M. and stating that "they banked" her.

63.    CW-3 was a participant in the kidnapping conspiracy. She provided sworn testimony that CARNEY, GOODMAN, JONES, and LANGLEY were the other individuals responsible for the kidnapping and murder of T.M.

## K.    Data and Communications from Phone Extractions

64.    Law enforcement obtained a state search warrant for the contents of JACKSON's cellular telephone and conducted a forensic data extraction from the phone. The search of the phone's contents revealed a group chat created by CARNEY that had nineteen participants, including phone numbers associated with GOODMAN, LANGLEY, JONES, and T.M.

65.    On April 25, 2023, CARNEY sent a text message entitled "Almighty Black P. Stone Nation," with a "head kount" containing the names of regional gang sets and local leaders. For the "Blakk Stone Gorillas" set, the text message lists "HK" as the top "Krown Prinxe," with "Baretta," the monicker associated with T.M., "Lady Henny," the monicker associated with GOODMAN, and "Baby D," the monicker associated with LANGLEY," all listed under HK's leadership. "Dominant," the monicker associated with JACKSON, was listed under the "NYC Blakk Stone Gorillas" heading. CARNEY's next text message to the group lists "Baretta" as the "Krown

Princess" of the "Vietnam Blakk5stone Gorillas 'Tribe.'" "Lady Henny" as the "First Lady" of the region encompassing the Hampton Roads area, "Baby D" as the "First Lady" of the region encompassing the Richmond area, and "Dominate" as the "First Lady" of the New York City region.

66.    From my training and experience, I am aware that gangs associated with the Bloods will avoid using the letter "c" in communications, as a result of their rivalry with the Crips. This practice is consistent with much of the content recovered from their targets on these cellular devices.

67.    A data extraction from the cellular telephone linked to JONES revealed a group chat labeled "ABPSN" with sixteen participants, including CARNEY, JACKSON, LANGLEY, and T.M. On September 20, 2022, HK sent the group a text labeled "Konstitution" that outlined the creed of the Black P. Stones, as well as the "Stone Motto" and "Oath" for gang members. A subsequent text from CARNEY elaborated on the "World Wide History" of the Black P. Stones, describing the founding of the Black P. Stone Nation in 1954 in Chicago. CARNEY then sent a "Memo" dated from December 23, 2021, describing several rules, including that "Kommunication is a must. Constant communication is necessary for each other's safety," and "ALL orders will be followed. Any command that's given shall not be ignored, if so you will be exiled and put on a plate."

68.    Texts in the ABPSN group chat discuss the best means of communication to evade the "feds" and law enforcement, with CARNEY "loving" a message on September 20, 2022, stating "'Telegram is made by fb' Only thing that's safe is Facetime any social communication over these lines be dead fr i barely even like being in the gc tbh but i aint eva heard of signal." CARNEY then replied, "Moreless People got to no & Understand tho as well like this is still a Gang / Organization that dem white ppl gone look at us even tho we ain't out here on no Wild dumb shit everybody got lane & Wave dat they generating some money in but y'all have to still understand on what kome with this shit beef / Might b Time or Ect feel me Kuz my Big Homie when I was Mad Stone Died for this sht . . . " JACKSON replied, "IM HERE TILL THE END." CARNEY then texted "A mandatory monthly fund of 21$ must be contributed to a fund that will be utilized for the goals and needs of the BPSN B-Line."

69.    Texts from the day before the homicide corroborate CW-1 and CW-2's testimony that members of the gang were planning to beat T.M. out of the gang but were prevented from doing so by a flat tire. On May 4, 2023, at 9:28 p.m., JACKSON's cellular telephone texted T.M. about JACKSON and others coming to T.M.'s apartment, stating "we otw to yah shii." At 10:43 p.m., JACKSON says, "Her tire got flat," to which T.M. responded "What's t? Kause this shit out of the blue. Don't beat round the bush. SAY WHAT IT ID AND WHAT IT AINT." JACKSON replied, "Wym what's out of the blue fytb." A few hours later, at 1:15 a.m., JACKSON texted T.M. "Yoooooo," and T.M. responded, "You niggas was supposed me dub me last night." GOODMAN's cellular telephone internet search history reflected searches for tire repair locations on May 4, 2023, at 10:22 p.m. GOODMAN also had a note reminder to "turn your phone off" on May 6, 2023, at 2:07 a.m.

70.    On May 6, 2023, the day of the murder, at 4:47 a.m., the phone linked to JONES texted JACKSON and asked, "Yo sis kan u see if my klip is in the ride." JACKSON replied that

she thinks it could be under the seat. At 10:31 a.m., JACKSON texted the group chat containing nineteen participants, including GOODMAN, LANGLEY, and CARNEY, "DO NOT TEXT IN THIS GX BY ANY MEAN DELETE THIS GX UNTIL FURTHER NOTICE."

71.     The phone linked to JONES sent text messages to LANGLEY at 1:44 p.m. on May 6, 2023, stating "Ma shook right now." The phone linked to JONES asks LANGLEY what they are going to do, and LANGLEY replies that they are "waiting on 5." JONES states that "this shit not it bl21d."

72.     After the murder, several of the suspected perpetrators conducted web searches consistent with consciousness of guilt. Specifically, LANGLEY's cellular telephone searched for "Yorktown News" multiple times on May 6, 2023, at approximately 2:54 p.m. At approximately 2:55 p.m., LANGLEY viewed a news story with the title "25-year-old woman's body found along Old Williamsburg Rd. in Yorktown area" and viewed the same story again at 3:25 p.m. At approximately 5:22 p.m., the phone showed a Google search conducted for "how do I turn off my location."

73.     Similarly, JACKSON's cellular telephone made several web searches on May 6, 2023, between 1:21 and 1:54 p.m. for "richmond news," "body found in York county, va," "breaking news yorktown, va," "Shooting in Yorktown Va yesterday," "Shooting in Yorktown VA today," "Yorktown news," and "Yorktown News, Va." From 1:54 to 1:56 p.m., JACKSON's phone also viewed a website for local crime news in Richmond and an NBC news article titled "Investigation underway after missing woman's body found in York County woods."

74.     A search of CARNEY's cellular telephone showed that at 1:29 p.m. on May 6, 2023, CARNEY's phone made several searches for "richmond va new channel." On May 9, 2023, CARNEY appeared to be reaching out to a contact named "harrelltimothy8" about trying to "disappear." His phone received a text message from the contact, stating: "Whoop… Pardon my soul for the late response..so I don't have any place that you can be low and Hustle..if you need to disappear I can help but if you're trying to trap as well.. I don't have that for you One."

L. **Identification of the TARGET ACCOUNTS**

75.     As noted above, members of the YPSO recovered GOODMAN, JACKSON, and LANGLEY's cellular telephones during the May 7, 2023, traffic stop, and search of the Hyundai Sonata. CARNEY's phone was recovered from his possession when he was arrested on May 10, 2023. These phones were searched pursuant to a state authorized search warrant.

76.     A forensic review of JACKSON'S cellular device shows that JACKSON had downloaded the Instagram application onto her cellular device and had been using the Instagram account username "skar_binhated."

77.     During the interview of T.M.'s friends and family members, CW-2 provided your affiant with a screenshot of what they believed was JACKSON's Instagram account titled "skar_binhated" ("TARGET ACCOUNT 1"). CW-2 knows this account belongs to JACKSON because CW-2 followed the Instagram account and saw photographs and videos of JACKSON

posted from TARGET ACCOUNT 1. A review of the screenshot shows a profile picture of an individual matching JACKSON's physical appearance. Other photos and videos of JACKSON are depicted on the publicly available profile, with one picture in particular showing JACKSON giving the middle finger to the camera with a distinctive butterfly tattoo on her hand. Photographs of this are seen below.



78.    A forensic review of JACKSON's cellular telephone shows a photograph of JACKSON posing with a firearm with the same matching butterfly tattoo posted by JACKSON on Instagram. JACKSON is depicted in the below photographs that were located on her cellular telephone.



79.    Further review of JACKSON's cellular telephone shows that JACKSON used TARGET ACCOUNT 1 to communicate with fellow BPSN members on her Instagram account in the days before the murder. For example, on May 4, 2023, JACKSON has an Instagram text conversation with an account named "XOTIC.PUNK." From text-based communications with

BPSN members, law enforcement has identified this account as belonging to a former BPSN member named Jaziyah Mobley, who has the gang monicker "Madam Cocaine."[3] In the Instagram message, JACKSON tells XOTIC.PUNK to "put me on to some money moves." XOTIC.PUNK "liked" JACKSON's comment and asked, "okay what type of lane u trynna be in?" and JACKSON stated, "some drugs or anything." This conversation occurred approximately two days before the homicide of T.M.

80.    JACKSON's cellular telephone also shows that JACKSON, through TARGET ACCOUNT 1 had Instagram video calls with an active BPSN member with the gang monicker "Blixky." Law enforcement has identified "Blixky" as Russel Baccus from Baccus's text message communications with JONES, and law enforcement believes that Baccus has sold firearms to JONES and other members of BPSN.

81.    Law enforcement analysis of Baccus' number ending in 5712 reveals that it is subscribed in the name of Russel Baccus. A mugshot photograph of Baccus compared to a photograph located on JONES' cellular device showing JONES and an individual believed to be Baccus, as well as the Instagram profile picture for "nba.russ" shows similar physical identifiers to Baccus. Baccus' Instagram name in internal communications with gang members is listed as "bg blixk," however, law enforcement believes that Baccus recently changed his Instagram name. Photographs of Baccus' mugshot and a picture of Baccus with JONES is depicted below.



---

[3] Law enforcement has reason to believe that a few months before T.M.'s murder, Mobley was "beaten out" of the same set of the Black P. Stones that the defendants belonged to.





82.    A forensic review of JONES' cellular phone shows that the Instagram account standin0business ("TARGET ACCOUNT 2") was connected to the device. A review of the private Instagram profile shown below displays a profile picture of a gang group photo. The original photograph, also shown below, was located on JONES' cellular device and depicts BPSN members displaying gang signs. Your affiant can recognize JONES as the individual standing furthest to the right in the photo.



83.    As seen on JONES' cellular phone extract, TARGET ACCOUNT 2 has Instagram communications with fellow BPSN members. For example, on January 10, 2023, JONES communicated with Baccus via his Instagram account "bg blixk" and stated "nikkas think imma lik imma blam some" and "these ward niggas." Baccus replied "mane fuxk dem niggas." JONES stated "I'm telling I'm have a bang out wit somebody soon I feel it." Baccus replied "mane yk I'm 10 behind u." Your affiant believes that JONES was having a dispute with unknown individuals in Jackson Ward, located in Richmond, Virgina, where JONES resided at the time. Your affiant also believes that JONES was discussing committing violence against these unknown individuals.

84.    During the interview of CW-2 with law enforcement, CW-2 also provided your affiant with a screenshot of what they believed was LANGLEY's Instagram account with the account name "jahh.dundada" ("TARGET ACCOUNT 3"). A forensic review of LANGLEY's cellular phone shows that TARGET ACCOUNT 3 is connected to LANGLEY's phone. A review of the screenshot shows a profile picture of an individual matching the description of LANGLEY. TARGET ACCOUNT 3 also has an Instagram story saved titled "It's Me Baby D." Your affiant knows from this investigation that LANGLEY's gang moniker is "Baby D" as a result of a forensic review of LANGLEY's cellular phone. Other photos and videos are depicted on the publicly available profile which match LANGLEY's appearance. Photographs of this are seen below.



85.    TARGET ACCOUNT 3 has also posted a group photo depicting CARNEY, JONES, JACKSON, Mobley, and Baccus, who at one point were all BPSN members or associates. There is also a seventh unidentified individual in the group photo. The caption of the photo states "BPS THE NAME WE ROKKIN NAHMSAYIN. #BIGSTONNIES 21KEYS DET WAYY!!  Blakk P Stone LOYALTY OVER EVERYTHING !!"  JONES' Instagram profile standin0business ("TARGET ACCOUNT 2") commented "Key 20 bl21d" and "skar_binhated ("TARGET ACCOUNT 1") commented "Key 20" on the photo.  From reviewing the defendants' communications, I believe that the photograph caption and comments are all relating to BPSN-related slogans and statements of loyalty to the gang.  A forensic review of LANGLEY's phone shows multiple versions of the same group photo that match the publicly available photograph from Instagram, some of which are included below.







86.    A review of LANGLEY's cellular phone data shows communications with fellow BPSN members on her Instagram account. For example, on February 20, 2023, LANGLEY, using

TARGET ACCOUNT 3 communicated with JONES, who was using TARGET ACCOUNT 2. JONES asked LANGLEY "youn got no other papers" and LANGLEY stated, "no them the only ones." Your affiant understands that in that message, JONES was asking LANGLEY if she had any other documentation from her arrest to prove that she did not cooperate in another criminal case. LANGLEY was previously charged with first degree murder in the City of Richmond in October 2022.

87.    On February 20, 2023, LANGLEY, through TARGET ACCOUNT 3, also sent TARGET ACCOUNT 2 the BPSN "Stone Kreed," a formal statement of BPSN beliefs: "OUT OF THE DARKNESS INTO THE LIGHT, BLACKSTONES GIVES US KOURAGE, BLACKSTONES GIVE US SIGHT, BLACKSTONE GIVES US SOMETHING NO MAN SHOULD BE DEPRIVED OF, A HAPPINESS KALLED STONE LOVE, ALL MEANS EVERYTHING , MIGHTY MEANS GREAT, AND THATS WHO WE ARE ALMIGHTY BLACKSTONES. FOR MANY ARE KALLED, BUT FEW ARE CHOSEN, A HEAP SEEK, BUT ONLY A FEW KNOWS THAT 9,000 MILES ACROSS THE EARTH LIVED A BLACKSTONE NAMED KAABaa WHO WE GET ARE NAME FROM BLACK P STONE, WHO EVER FALLS UPON A STONE SHALL BE CRUSHED, WHOEVER A STONE FALLS UPON SHALL BE GROUNDED INTO DUST, BLACK P STONE IS ALL WE TRUST 21 GUNZ SALUTE."

88.    Further review of LANGLEY's cellular phone also shows that from September 14, 2022, to May 5, 2023, TARGET ACCOUNT 3 had communications with BPSN member Baccus. However, the cellular device download does not show the content of those messages.

89.    A forensic review of GOODMAN's phone shows that Instagram account therealhennessi ("TARGET ACCOUNT 4") is connected to GOODMAN's cellular device. A review of the publicly available profile for TARGET ACCOUNT 4 shows a profile picture, as well as videos and photographs of an individual that match GOODMAN's physical appearance. TARGET ACCOUNT 4's account description states "To Book Email: Hennidabrat@gmail.com." A review of GOODMAN's cellular phone shows that the Gmail account Hennidabrat@gmail.com is connected to her cellular phone. A screenshot of TARGET ACCOUNT 4 is depicted below.



90.    A review of GOODMAN's cellular phone reveals that GOODMAN has had Instagram communications with an account named "MoneyRunDraxo" that may be related to T.M.'s murder.  On May 5, 2023, the evening before the murder, at 10:13 p.m., "MoneyRunDraxo" messaged TARGET ACCOUNT 4 stating "You never answered my question what's the issue." GOODMAN, through TARGET ACCOUNT 4 replied, "these bitches ain't on shit!" "MoneyRunDraxo then stated, "Why they want to fight though."  Your affiant believes this "fight" may be a reference to the "beat out" of T.M. in the early morning hours on May 6, 2023.

91.    On May 6, 2023, 2:08 a.m., MoneyRunDraxo stated "Waab you wack aab so who do is this that got yo name on them.  He got you with that one right.  You know me ill have that nigga left like the last nigga." At 2:09 p.m., GOODMAN stated "I love you." GOODMAN started an Instagram video chat with MoneyRunDraxo at 4:14 p.m. and had no further text-based conversations.

92.    Finally, law enforcement has identified an Instagram account belonging to the victim of the kidnapping and murder, T.M., as "teelocd" ("TARGET ACCOUNT 5").  On May 6, 2023, an officer from YPSO spoke with T.M.'s sister, who identified TARGET ACCOUNT 5 as the one her sister utilized.  A review of TARGET ACCOUNT 5 depicts a profile picture matching the physical appearance of T.M.  The background of the profile picture also matches T.M.'s residence where she

was kidnapped, located at \*\*\*\* Bethel St. in Richmond, Virginia. Furthermore, TARGET ACCOUNT 5 lists T.M.'s gang moniker, "Baretta," in her profile description. Law enforcement knows T.M.'s moniker is Barretta as a result of reviewing text-based communications that T.M. had with other BPSN gang members. Photographs of T.M.'s Instagram profile and a picture of the inside of the residence from the state search warrant where T.M. took her Instagram profile photograph are depicted below.





## BACKGROUND CONCERNING META AND RELEVANT TECHNOLOGY

93.     Instagram is a service owned by Meta, a United States company and a provider of an electronic communications service as defined by 18 U.S.C. §§ 3127(1) and 2510. Specifically, Instagram is a free-access social networking service, accessible through its website and its mobile application, that allows subscribers to acquire and use Instagram accounts, like the target account(s) listed in Attachment A, through which users can share messages, multimedia, and other information with other Instagram users and the general public.

94.     Meta collects basic contact and personal identifying information from users during the Instagram registration process. This information, which can later be changed by the user, may include the user's full name, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, credit card or bank account number, and other personal identifiers. Meta keeps records of changes made to this information.

95.     Meta also collects and retains information about how each user accesses and uses Instagram. This includes information about the Internet Protocol ("IP") addresses used to create and use an account, unique identifiers and other information about devices and web browsers used to access an account, and session times and durations.

96.     Each Instagram account is identified by a unique username chosen by the user. Users can change their usernames whenever they choose but no two users can have the same usernames at the same time. Instagram users can create multiple accounts and, if "added" to the

same primary account, can switch between the associated accounts on a device without having to repeatedly log-in and log-out.

97.    Instagram users can also connect their Instagram and Facebook accounts to utilize certain cross-platform features, and multiple Instagram accounts can be connected to a single Facebook account. Instagram accounts can also be connected to certain third-party websites and mobile apps for similar functionality. For example, an Instagram user can "tweet" an image uploaded to Instagram to a connected Twitter account or post it to a connected Facebook account or transfer an image from Instagram to a connected image printing service. Meta maintains records of changed Instagram usernames, associated Instagram accounts, and previous and current connections with accounts on Meta and third-party websites and mobile apps.

98.    Instagram users can "follow" other users to receive updates about their posts and to gain access that might otherwise be restricted by privacy settings (for example, users can choose whether their posts are visible to anyone or only to their followers). Users can also "block" other users from viewing their posts and searching for their account, "mute" users to avoid seeing their posts, and "restrict" users to hide certain activity and prescreen their comments. Instagram also allows users to create a "close friends list" for targeting certain communications and activities to a subset of followers.

99.    Users have several ways to search for friends and associates to follow on Instagram, such as by allowing Meta to access the contact lists on their devices to identify which contacts are Instagram users. Meta retains this contact data unless deleted by the user and periodically syncs with the user's devices to capture changes and additions. Users can similarly allow Meta to search an associated Facebook account for friends who are also Instagram users. Users can also manually search for friends or associates.

100.    Each Instagram user has a profile page where certain content they create and share ("posts") can be viewed either by the general public or only the user's followers, depending on privacy settings. Users can customize their profile by adding their name, a photo, a short biography ("Bio"), and a website address.

101.    One of Instagram's primary features is the ability to create, edit, share, and interact with photos and short videos. Users can upload photos or videos taken with or stored on their devices, to which they can apply filters and other visual effects, add a caption, enter the usernames of other users ("tag"), or add a location. These appear as posts on the user's profile. Users can remove posts from their profiles by deleting or archiving them. Archived posts can be reposted because, unlike deleted posts, they remain on Meta's servers.

102.    Users can interact with posts by liking them, adding or replying to comments, or sharing them within or outside of Instagram. Users receive notification when they are tagged in a post by its creator or mentioned in a comment (users can "mention" others by adding their username to a comment followed by "@"). An Instagram post created by one user may appear on the profiles or feeds of other users depending on a number of factors, including privacy settings and which users were tagged or mentioned.

103.    An Instagram "story" is similar to a post but can be viewed by other users for only 24 hours. Stories are automatically saved to the creator's "Stories Archive" and remain on Meta's servers unless manually deleted. The usernames of those who viewed a story are visible to the story's creator until 48 hours after the story was posted.

104.    Instagram allows users to broadcast live video from their profiles. Viewers can like and add comments to the video while it is live, but the video and any user interactions are removed from Instagram upon completion unless the creator chooses to send the video to IGTV, Instagram's long-form video app.

105.    Instagram Direct, Instagram's messaging service, allows users to send private messages to select individuals or groups. These messages may include text, photos, videos, posts, videos, profiles, and other information. Participants to a group conversation can name the group and send invitations to others to join. Instagram users can send individual or group messages with "disappearing" photos or videos that can only be viewed by recipients once or twice, depending on settings. Senders can't view their disappearing messages after they are sent but do have access to each message's status, which indicates whether it was delivered, opened, or replayed, and if the recipient took a screenshot. Instagram Direct also enables users to video chat with each other directly or in groups.

106.    Instagram offers services such as Instagram Checkout and Facebook Pay for users to make purchases, donate money, and conduct other financial transactions within the Instagram platform as well as on Facebook and other associated websites and apps. Instagram collects and retains payment information, billing records, and transactional and other information when these services are utilized.

107.    Instagram has a search function which allows users to search for accounts by username, user activity by location, and user activity by hashtag. Hashtags, which are topical words or phrases preceded by a hash sign (#), can be added to posts to make them more easily searchable and can be "followed" to generate related updates from Instagram. Meta retains records of a user's search history and followed hashtags.

108.    Meta collects and retains location information relating to the use of an Instagram account, including user-entered location tags and location information used by Meta to personalize and target advertisements.

109.    Meta uses information it gathers from its platforms and other sources about the demographics, interests, actions, and connections of its users to select and personalize ads, offers, and other sponsored content. Meta maintains related records for Instagram users, including information about their perceived ad topic preferences, interactions with ads, and advertising identifiers. This data can provide insights into a user's identity and activities, and it can also reveal potential sources of additional evidence.

110.    In some cases, Instagram users may communicate directly with Meta about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Meta typically retain records about such communications,

including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

111.    For each Instagram user. Meta collects and retains the content and other records described above. sometimes even after it is changed by the user (including usernames, phone numbers, email addresses, full names. privacy settings, email addresses, and profile bios and links).

112.    In my training and experience, evidence of who was using Instagram and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above. This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

113.    For example, the stored communications and files connected to an Instagram account may provide direct evidence of the offenses under investigation. Based on my training and experience, instant messages, voice messages, photos, videos, and documents are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation.

114.    In addition, the user's account activity, logs, stored electronic communications, and other data retained by Meta can indicate who has used or controlled the account. It will also provide information on the users who have communicated with this subject. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information, messaging logs, photos, and videos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the account at a relevant time. As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

115.    Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation. For example, information on the account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a kidnapping), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

116.    Other information connected to the use of Instagram may lead to the discovery of additional evidence. For example, the activities of the account users on the days of the kidnapping may reveal services used in furtherance of the kidnapping or messaging used to communicate with co-conspirators. In addition, stored communications, contact lists, photos, and videos can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

117.    Therefore, Meta's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Instagram. In my training and experience, such

information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

118.    I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A), by using the warrant to require Meta to disclose to the government copies of the records and other information particularly described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

119.    Based on the aforementioned information, I respectfully submit that probable cause exists to believe that **CARNEY**, **JACKSON**, **LANGLEY**, **GOODMAN**, **JONES**, among other known and unknown co-conspirators, have committed violations of 18 U.S.C. § 1201(c) (Conspiracy to Commit Kidnapping), 18 U.S.C. § 1201(a)(1) (Kidnapping Resulting in Death), and 18 U.S.C. § 1959(a)(1) (Murder in Aid of Racketeering), and that evidence, contraband, and fruits and instrumentalities of such crimes, as described in Attachment B, will be located in the **TARGET ACCOUNTS**, described in Attachment A.

FURTHER YOUR AFFIANT SAYETH NOT.

Daniel F. Woloszynowski II,
Special Agent
Bureau of Alcohol, Tobacco, Firearms and Explosives

3rd *RJK*

Sworn and subscribed to me before this 2nd day of May 2024

Robert J. Krask
United States Magistrate Judge

SEEN AND APPROVED

_____/s/ Mack Coleman_____
Lisa R. McKeel
D. Mack Coleman
Assistant United States Attorneys
Alyssa Levey-Weinstein
Special Assistant United States Attorney

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with the following Instagram Accounts:

@skar_binhated ("**TARGET ACCOUNT 1**"), user ID of 7892670261

@standin0nbusiness ("**TARGET ACCOUNT 2**"), user ID of 1644937064

@jahh.dundada ("**TARGET ACCOUNT 3**"), user ID of 50202794176v

@therealhennessi_ ("**TARGET ACCOUNT 4**"), user ID of 1969634825

@teelocd ("**TARGET ACCOUNT 5**"), user ID of 3628629711

(collectively "the TARGET ACCOUNTS") that is stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc. ("Meta"), an electronic communications services provider and/or remote computing services provider, which accepts service of legal process at 1601 Willow Road, Menlo Park, California 94025.

## ATTACHMENT B

### Particular Things to be Seized

**I.     Information to be disclosed by Meta Platforms, Inc. ("Meta")**

To the extent that the information described in Attachment A is within the possession, custody, or control of Meta, regardless of whether such information is located within or outside of the United States, and including any emails, records, files, logs, or information that has been deleted but is still available to Meta, Meta is required to disclose the following information to the government for the TARGET ACCOUNTS or identifier listed in Attachment A:

A.     All business records and subscriber information, in any form kept, pertaining to the TARGET ACCOUNTS, including:

1.     Identity and contact information (past and current), including full name, e-mail addresses, physical address, date of birth, phone numbers, gender, hometown, occupation, websites, and other personal identifiers;

2.     All Instagram usernames (past and current) and the date and time each username was active, all associated Instagram and Facebook accounts (including those linked by machine cookie), and all records or other information about connections with Facebook, third-party websites, and mobile apps (whether active, expired, or removed);

3.     Length of service (including start date), types of services utilized, purchases, and means and sources of payment (including any credit card or bank account number) and billing records;

4.     Devices used to login to or access the TARGET ACCOUNTS, including all device identifiers, attributes, user agent strings, and information about networks and connections, cookies, operating systems, and apps and web browsers;

5.     All advertising information, including advertising IDs, ad activity, and ad topic preferences;

6.     Internet Protocol ("IP") addresses used to create, login, and use the TARGET ACCOUNTS, including associated dates, times, and port numbers, from March 1, 2023, to July 1, 2023;

7.     Privacy and account settings, including change history; and

8.     Communications between Meta and any person regarding the TARGET ACCOUNTS, including contacts with support services and records of actions taken;

B.    All content (whether created, uploaded, or shared by or with the TARGET ACCOUNTS), records, and other information relating to videos (including live videos and videos on IGTV), images, stories and archived stories, past and current bios and profiles, posts and archived posts, captions, tags, nametags, comments, mentions, likes, follows, followed hashtags, shares, invitations, and all associated logs and metadata, from March 1, 2023, to July 1, 2023;

C.    All content, records, and other information relating to communications sent from or received by the TARGET ACCOUNTS from March 1, 2023, to July 1, 2023, including but not limited to:

    1.    The content of all communications sent from or received by the TARGET ACCOUNTS, including direct and group messages, and all associated multimedia and metadata, including deleted and draft content if available;

    2.    All records and other information about direct, group, and disappearing messages sent from or received by the TARGET ACCOUNTS, including dates and times, methods, sources and destinations (including usernames and account numbers), and status (such as delivered, opened, replayed, screenshot);

    3.    All records and other information about group conversations and video chats, including dates and times, durations, invitations, and participants (including usernames, account numbers, and date and time of entry and exit); and

    4.    All associated logs and metadata;

D.    All content, records, and other information relating to all other interactions between the TARGET ACCOUNTS and other Instagram users from March 1, 2023, to July 1, 2023, including but not limited to:

    1.    Interactions by other Instagram users with the TARGET ACCOUNTS or its content, including posts, comments, likes, tags, follows (including unfollows, approved and denied follow requests, and blocks and unblocks), shares, invitations, and mentions;

    2.    All users the TARGET ACCOUNTS have followed (including the close friends list), unfollowed, blocked, unblocked, muted, restricted, or denied a request to follow, and of users who have followed, unfollowed, blocked, unblocked, muted, restricted, or denied a request to follow the account;

    3.    All contacts and related sync information; and

    4.    All associated logs and metadata;

E.    All records of searches performed by the TARGET ACCOUNTS from March 1, 2023, to July 1, 2023; and

F.     All location information, including location history, login activity, information geotags, and related metadata from March 1, 2023, to July 1, 2023.

Meta is hereby ordered to disclose the above information to the government within 14 days of issuance of this warrant, via United States mail, courier, or email to the following law enforcement agent:

Special Agent Daniel F. Woloszynowski
Bureau of Alcohol, Tobacco, Firearms
and Explosives
Washington Field Division
Newport News Field Office
200 Granby Street,
Suite 339, Norfolk, VA
23510
Telephone: (757) 974-3502
Email:Daniel.woloszynowski2@atf.gov

## II.     Information to be Seized by the Government

All information described above in Section I that constitutes evidence of violations of 18 U.S.C. § 1201(c) (Conspiracy to Commit Kidnapping), 18 U.S.C. § 1201(a)(1) (Kidnapping Resulting in Death), and 18 U.S.C. § 1959(a)(1) (Murder in Aid of Racketeering), involving **HEZEKIAH CARNEY ("CARNEY"), DONNISHA GOODMAN ("GOODMAN"), ACACIA JACKSON ("JACKSON"), JAYQUAN JONES ("JONES"), and JAMICA LANGLEY**, between March 1, 2023, to July 1, 2023, including, for the TARGET ACCOUNTS listed on Attachment A and for the accompanying dates, information pertaining to the following matters:

a.  Communications, images, media, or other information reflecting the coordination, planning, or execution of a kidnapping;
b.  Communications, images, media, or other information regarding weapons, such as firearms and ammunition;
c.  Preparatory steps taken in furtherance of kidnapping;
d.  Possession of proceeds from criminal activities;
e.  Address/phone books or contact information that reflect names of potential criminal associates and co-conspirators;
f.  Communications, images, media, or other information regarding gang activity, meetings, crimes, planning, dues, or violations;
g.  Evidence indicating how and when the TARGET ACCOUNTS were accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the account owner;
h.  Evidence indicating the Instagram account owner's state of mind as it relates to the crime under investigation;
i.  The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

This warrant authorizes a review of electronically stored information, communications,

other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.